SKANDIA AMERICA REINSURANCE CORPORATION, Peter Frank Tiarks, as Lead Underwriter, and Francis Everett Brander, as Lead Underwriter, Plaintiffs,

v.

Benjamin R. SCHENCK, as Superintendent of Insurance of the State of New York, and as Liquidator of Professional Insurance Company of New York, and the New Jersey Property-Liability Insurance Guaranty Association, Defendants.

GENERAL REINSURANCE CORPORATION, Plaintiff,

v.

Benjamin R. SCHENCK, as Superintendent of Insurance of the State of New York, and as Liquidator of Professional Insurance Company of New York, and the New Jersey Property-Liability Insurance Guaranty Association, Defendants.

Nos. 74 Civ. 5470, 75 Civ. 120.

United States District Court,
S. D. New York.

Nov. 21, 1977.

---

Kroll, Edelman, Elser & Wilson, New York City, for Skandia America Reinsurance Corp., Peter Frank Tiarks and Francis Everett Brander; Sol Kroll and Roy E. Pomerantz, New York City, of counsel.

Davis Polk & Wardwell, New York City, for General Reinsurance Corp.; Alfred E. Schretter, New York City, of counsel.

McGuire & Lawler, New York City, for The New Jersey Property-Liability Ins. Guaranty Ass'n; Andrew M. Lawler, New York City, of counsel.

Stryker, Tams & Dill, Newark, N. J., for The New Jersey Property-Liability Ins. Guaranty Ass'n; Elizabeth A. Westcott, Newark, N. J., Walter F. Waldau, Summit, N. J., of counsel.

Carb, Luria, Glassner, Cook & Kufeld, New York City, for Benjamin R. Schenck; Lewis Bart Stone, Jeffrey G. Gurren, New York City, of counsel.

Charles W. Havens, III, Washington, D. C., for Reinsurance Ass'n of America amicus curiae.

GAGLIARDI, District Judge.

█ This consolidation of two federal statutory interpleader actions raises a novel issue of insurance law. The plaintiff-stakeholders are reinsurance companies and underwriters who entered into reinsurance treaties several years ago with a presently insolvent casualty insurer. These treaties obligate plaintiffs, Skandia America Reinsurance Corporation ("Skandia"), General Reinsurance Corporation ("General Reinsurance"), and Peter Frank Tiarks and Francis Everett Brander, Lead Underwriters for Lloyd's of London ("Lloyd's"), to indemnify the insurer for liability on the policies it issued in excess of specified amounts of retained risk. Each treaty contains an "insolvency clause," which provides that in the event of the insurer's insolvency, the reinsurance proceeds which come due are payable to its "liquidator, receiver or statutory successor." Defendant Benjamin R. Schenck, Superintendent of Insurance of the State of New York ("Superintendent"),[1] and the New Jersey Property-Liability Insurance Guaranty Association ("Guaranty"), each claiming to be the insolvent's statutory successor and, as such, entitled to the proceeds, have cross-moved for summary judgment pursuant to Rule 56, Fed.R.Civ.P.[2] For the reasons which follow, the Superintendent's motion is granted and Guaranty's motion is denied. In addition, plaintiffs have moved to recover their attorneys' fees and disbursements.

### Statement of Facts

The material facts, by virtue of a stipulation thereto on behalf of all the parties, are not in dispute. Prior to its insolvency, the Professional Insurance Company of New York ("Professional") was a casualty insurance company domiciled in New York and licensed to do business in numerous states, including New Jersey. Professional insured medical malpractice risks and, to limit its exposure on the policies it issued, entered into reinsurance treaties with the plaintiffs. These treaties, which took the form of "excess of loss" agreements, required plaintiffs to indemnify Professional for the excess of specified amounts of retained risk. Each of these treaties provided, moreover, that in the event of Professional's insolvency, the reinsurance afforded would be payable without diminution because of insolvency either directly to Professional or to its "liquidator, receiver or statutory successor." (Stipulation of Facts, Exhib. A, art. X; id., Exhib. B, art. III; id., Exhib. C, art. XI).

In 1973, Professional suffered irreversible financial difficulties. Defendant Superintendent declared Professional insolvent, and on October 17, the New York State Supreme Court, pursuant to N.Y. Ins. Law § 512 (McKinney 1966),[3] ordered the Superintendent to take possession of Profession-

---

1. The president Superintendent of Insurance is Thomas A. Harnett. Pursuant to Rule 25(d), Fed.R.Civ.P., this action does not abate and Superintendent Harnett is automatically substituted as a party.

2. The Reinsurance Association of America, a trade association of reinsurance companies, has moved for leave to file a brief amicus curiae. In light of the complex and novel issues raised by the parties, this motion is granted.

3. Section 512 provides:
 § 512. Order of rehabilitation; termination
 1. An order to rehabilitate a domestic insurer shall direct the superintendent and his successors in office forthwith to take possession of the property of such insurer and to conduct the business thereof, and to take such steps toward the removal of the causes and conditions which have made such proceeding necessary as the court shall direct.
 2. If at any time the superintendent shall deem that further efforts to rehabilitate such insurer would be futile, he may apply to the court under this article for an order of liquidation.
 3. The superintendent or any interested person upon due notice to the superintendent, at any time, may apply for an order terminating any rehabilitation proceeding and permitting such insurer to resume possession of its property and the conduct of its business, but no such order shall be granted except when, after a full hearing, the court shall determine that the purposes of the proceeding have been fully accomplished.

al's property for the purpose of rehabilitation. The Superintendent was unable to effect a rehabilitation of the company, and on April 12, 1974, the Supreme Court ordered him to liquidate Professional pursuant to N.Y. Ins. Law § 514 (McKinney 1966).[4] In accordance with that section, the Superintendent began to marshall Professional's assets and to receive claims for consideration and allowance in order that Professional's assets could be ratably distributed to its creditors. The Superintendent, therefore, demanded from plaintiffs the reinsurance proceeds that were due Professional on its matured risks.

Effective April 11, 1974, the New Jersey legislature created defendant Guaranty, pursuant to the New Jersey Property-Liability Guaranty Act ("New Jersey Guaranty Act"), codified as N.J.Stat.Ann. §§ 17:30A–1 to –19 (West Cum.Supp. 1977–78) (amended 1974).[5] Guaranty is a private non-profit association of insurers writing property and liability insurance policies in New Jersey. Its purpose is to protect New Jersey insureds against insurer insolvencies by making good on unpaid claims against insolvent insurers doing business in New Jersey. See id. §§ 17:30A–2(a), –5(d), –5(e). Guaranty is authorized to raise the funds to pay these claims by making assessments against its member insurers in proportion to the amount of "net direct written premiums"[6] each generates in a particular calendar year. Id. § 17:30A–8(a)(3). The member insurers are, in turn, empowered to increase the rates and premiums they charge by amounts sufficient to recoup the amounts they pay to Guaranty. Id. § 17:30A–16. After completing its organization process, Guaranty undertook its statutory duty of paying covered claims on Professional's New Jersey risks. Some of these New Jersey risks Guaranty paid have been sufficiently large to trigger plaintiffs' obligations under their reinsurance treaties

4. Section 514 provides in pertinent part:

§ 514. Order of liquidation; rights and liabilities

1. An order to liquidate the business of a domestic insurer shall direct the superintendent and his successors in office forthwith to take possession of the property of such insurer and to liquidate the business of the same and to deal with the property and business of such insurer in their own names as superintendents or in the name of the insurer as the court or justice before whom such order is returnable may direct, and to give notice to all creditors who may have claims against such insurers to present the same.

2. The superintendent and his successors shall be vested by operations of law with the title to all of the property, contracts and rights of action of such insurer as of the date of the entry of the order so directing them to liquidate. The filing or recording of such order in any record office of the state shall impart the same notice that a deed, bill of sale or other evidence of title duly filed or recorded by such insurer would have imparted. The rights and liabilities of any such insurer and of its creditors, policyholders, stockholders, members and all other persons interested in its estate shall, unless otherwise directed by the court, be fixed as of the date of the entry of the order directing the liquidation of such insurer in the office of the clerk of the county where such insurer had its principal office for the transaction of business upon the date of the institution of proceedings under this article, subject, however, to the provisions of section five hundred forty-four with respect to the rights of claimants holding contingent claims.

5. The New Jersey Guaranty Act is an almost verbatim enactment of the National Association of Insurance Commissioners' Model Bill for State Post-Assessment Insurance Guaranty Associations ("NAIC Model Bill"). Compare 1970 NAIC Proceedings, vol. 1, at 253–61 with N.J.Stat.Ann. §§ 17:30A–1 to –19 (West Cum. Supp. 1977–78). Approximately 45 states have adopted the NAIC Model Bill or similar legislation. See Fireman's Fund Ins. Co. v. Arizona Ins. Guar. Ass'n., 22 Ariz.App. 453, 528 P.2d 839, 841 n. 1 (1975) (footnote omitted in official reporter).

6. The New Jersey Guaranty Act defines "net direct written premiums" as "direct gross premiums written in [New Jersey] on insurance policies to which this act applies, less return premiums thereon and dividends paid or credited to policyholders on such direct business." N.J.Stat.Ann. § 17:30A–5(g) (West Cum.Supp. 1977–78). The act applies to "all kinds of direct insurance, except life insurance, accident and health insurance, workmen's compensation insurance, title insurance, annuities, surety bonds and insurance provided by the Motor Vehicle Liability Security Fund . . . until funds comprising said fund are declared exhausted" by the New Jersey Commissioner of Insurance. Id. § 17:30A–2(b).

with Professional.[7] It may be expected, moreover, that other New Jersey risks reinsured by plaintiffs will soon mature.

Section 8(a)(2) of the New Jersey Guaranty Act provides that Guaranty "[b]e deemed the [insolvent] insurer to the extent of its obligation on the covered claims and to such extent has all rights, duties, and obligations of the insolvent insurer as if the insurer had not become insolvent." *Id.* § 17:30A–8(a)(2). Relying upon this section to claim that it is Professional's statutory successor under the reinsurance treaties or, alternatively, that it is equitably subrogated to Professional's claims against the plaintiffs because it has paid its matured New Jersey risks, Guaranty has demanded from plaintiffs all of the reinsurance proceeds arising out of the matured New Jersey risks. In addition, to preserve its right to a distribution of Professional's assets in the New York liquidation proceedings, Guaranty filed a proof of claim with the Superintendent pursuant to N.Y. Ins. Law § 544 for the amount it had paid on account of Professional's policy obligations.

Plaintiffs admit their liability to pay proceeds under the reinsurance treaties, both as to risks that have matured and as to others that will do so. Because Profession-

al was dissolved by the New York Supreme Court's order of liquidation, plaintiffs' obligation to pay the reinsurance proceeds runs to Professional's "liquidator, receiver or statutory successor." Faced with the conflicting claims of the Superintendent and Guaranty, which had escalated into separate state court lawsuits in New York and New Jersey, plaintiffs commenced two separate actions under the Federal Interpleader Act, 28 U.S.C. § 1335 (1970). Soon thereafter, this court issued an order restraining the Superintendent and Guaranty from instituting or prosecuting any proceeding affecting the reinsurance proceeds. *Skandia America Reins. Corp. v. Schenck*, No. 74–5470 (S.D.N.Y. Jan. 23, 1975). The two interpleader actions were subsequently consolidated by stipulation, and the instant cross-motions for summary judgment followed.

### Jurisdiction

In its earlier decision ordering the claimants to refrain from prosecuting actions against the plaintiffs, this court determined that it could properly exercise subject matter jurisdiction over this action. All of the requirements of the federal interpleader

---

7. As set forth in the stipulation of facts, the following matured New Jersey risks have given rise to plaintiffs' reinsurance obligations:

a) *Capodici v. Storaci.* This case, reinsured by Skandia and Lloyd's, was settled for $100,000, generating $67,500 of reinsurance proceeds, plus adjustment expenses. Guaranty has paid the claimant in full. Skandia and Lloyd's were the reinsurers and have paid $75,000 into the registry of this court to cover their liability therefor including adjustment expenses yet to be determined.

b) *Abate v. Skupinsky.* This case was settled for $40,000, generating reinsurance proceeds, as adjusted, in the amount of $26,-769.88. Guaranty has paid the claimant in full. General Reinsurance was the reinsurer and has submitted a bond, covering the $26,-769.88, payable to the proper recipient.

c) *Gammarro v. DePhillips.* This case was settled for $57,500, generating reinsurance proceeds, as adjusted, of $43,039.97. Guaranty has paid the claimant in full. General Reinsurance was the reinsurer and has submitted a bond, covering the $43,039.97, payable to the proper recipient.

d) *Dempkowski v. Orleanski.* This case was settled for $35,000, generating reinsurance proceeds of $20,000 plus adjustment expenses. Guaranty has paid the claimant in full. General Reinsurance was the reinsurer, but has neither made payment of such proceeds or adjustment expenses to the court, nor has submitted a bond in said amounts as yet.

e) *Flanagan v. Bahnson.* This case was settled for $90,000, generating reinsurance proceeds of $65,000 plus adjustment expenses. Guaranty has paid the claimant in full. General Reinsurance was the reinsurer, but has neither made payment of such proceeds or adjustment expenses to the court, nor has submitted a bond in said amounts as yet.

f) *Jablonski v. Olesnicky.* This case was settled for $35,000, generating reinsurance proceeds of $10,000 plus adjustment expenses. Guaranty has paid the claimant in full. Skandia and Lloyd's were the reinsurers, but have neither made payment of such proceeds or adjustment expenses to the court, nor have submitted a bond in said amounts as yet.

statute appeared to be met. The amount in controversy exceeded $500, and the fact that the Superintendent's and Guaranty's claims did not have a common origin or were, in part, only potential claims did not defeat jurisdiction. *See* 28 U.S.C. § 1335 (1970). Moreover, this court held that because the rival claimants were citizens of New York and New Jersey respectively, the minimum diversity among claimants required by the statute appeared to be met. *Skandia America Reins. Corp. v. Schenck,* No. 74–5470, at 4–5 (S.D.N.Y. Jan. 23, 1975), *citing State Farm Fire & Cas. Co. v. Tashire,* 386 U.S. 523, 87 S.Ct. 1199, 18 L.Ed.2d 270 (1967) *and Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Cavicchia,* 311 F.Supp. 149 (S.D.N.Y.1970). Although none of the parties has questioned this initial determination that the exercise of jurisdiction is proper, further clarification of that decision may be helpful in light of the fact that the Superintendent has been sued in his official capacity.

■ Federal statutory interpleader is available only if there are "[t]wo or more adverse claimants of diverse citizenship as defined in section 1332 of [title 28]." 28 U.S.C. § 1335(a)(1) (1970). A state is not a "citizen" for purposes of diversity jurisdiction. Consequently, a suit between a state and a citizen of another state falls without the diversity jurisdiction of the federal courts. *Moor v. County of Alameda,* 411 U.S. 693, 717, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973); *Postal Telegraph Cable Co. v. Alabama,* 155 U.S. 482, 487, 15 S.Ct. 192, 39 L.Ed. 231 (1894). The state need not be named as a party to defeat jurisdiction: an officer or an agency which is simply "the arm or *alter ego* of the State" may not be sued in diversity. *State Highway Comm'n v. Utah Constr. Co.,* 278 U.S. 194, 199, 49

S.Ct. 104, 73 L.Ed. 262 (1929) (emphasis in original); *accord, Krisel v. Duran,* 386 F.2d 179, 181 (2d Cir. 1967) (per curiam). Thus, in *Riley v. Worcester Cty. Trust Co.,* 89 F.2d 59, 65–68 (1st Cir.), *aff'd on other grounds,* 302 U.S. 292, 58 S.Ct. 185, 82 L.Ed. 268 (1937), the Court of Appeals for the First Circuit held that plaintiff's attempt to interplead state tax commissioners as adverse claimants was impermissible under the Federal Interpleader Act.

■ The Eleventh Amendment of the Constitution similarly presents an apparent obstacle to the exercise of federal court jurisdiction.[8] While the Amendment does not, on its face, bar suits against a state by its own citizens, an unconsenting state may not be sued in federal courts by either her own citizens or citizens of another state. *Edelman v. Jordan,* 415 U.S. 651, 662–63, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). Moreover, even though the state is not named as a party to the action, the suit may nonetheless be barred by the Amendment. *Edelman v. Jordan, supra,* 415 U.S. at 663, 94 S.Ct. 1347; *Ford Motor Co. v. Dep't of Treasury,* 323 U.S. 454, 464, 65 S.Ct. 347, 89 L.Ed. 389 (1945). Thus, in *Worcester Cty. Co. v. Riley,* 302 U.S. 292, 299–300, 58 S.Ct. 185, 82 L.Ed. 268 (1937), the Supreme Court held that plaintiff's attempt to interplead state tax commissioners as adverse claimants violated the Eleventh Amendment.

■ To the extent that this interpleader action may be a suit against the state, therefore, the federal interpleader statute does not permit, and the Eleventh Amendment prohibits, the exercise of federal court jurisdiction.[9] Suing an officer in his offi-

---

8. The Eleventh Amendment states that:
 [t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

9. One crucial distinction between the Federal Interpleader Statute and the Eleventh Amendment is that while a state may waive its Elev-

enth Amendment immunity, *Parden v. Terminal Ry.,* 377 U.S. 184, 186, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964), "[n]o consent by the State to submit itself to suit could affect the question of diverse citizenship" for the purposes of this court's subject matter jurisdiction. *State Highway Comm'n. v. Utah Constr. Co.,* 278 U.S. 194, 199–200, 49 S.Ct. 104, 106, 73 L.Ed. 262 (1929).

cial capacity, however, does not mandate the conclusion that jurisdiction will not lie. In both the diversity statute and Eleventh Amendment contexts, the courts have applied the identical test to ascertain whether the suit is barred: the determinative factor is whether the state is the real party in interest. *Edelman v. Jordan, supra,* 415 U.S. at 663, 94 S.Ct. 1347 (Eleventh Amendment); *State Highway Comm'n. v. Utah Constr. Co., supra,* 278 U.S. at 200, 49 S.Ct. 104 (diversity statute); *Krisel v. Duran, supra,* 386 F.2d at 181 (diversity statute); *Porter v. Beha,* 12 F.2d 513, 517 (2d Cir. 1926) (Eleventh Amendment); *Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Cavicchia, supra,* 311 F.Supp. at 154–55 (Eleventh Amendment). Several criteria have been developed to determine whether the state is a real party in interest. "[I]f compliance with any decree entered by the court does not require the doing of any affirmative act which affects the state's political or property rights, the state is not the real party." *Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Cavicchia, supra,* 311 F.Supp. at 155, *citing Hopkins v. Clemson College,* 221 U.S. 636, 31 S.Ct. 654, 55 L.Ed. 890 (1911). A state official appointed to perform acts and duties which, though appropriate for governments, do not involve any sovereign rights of that state, is not immune from suits *virtute officii. Porter v. Beha, supra,* 12 F.2d at 517. That litigation may implicate the state's general governmental interest in the welfare of its citizens is insufficient to preclude the exercise of jurisdiction. *Missouri, Kansas & Texas Ry.*

*v. Missouri R.R. & Warehouse Comm'rs,* 183 U.S. 53, 60, 22 S.Ct. 18, 46 L.Ed. 78 (1901).

■ Applying these principles to the case at bar, it is clear that the State of New York is not a real party in interest in this litigation. While the Superintendent claims the proceeds of the reinsurance treaties in his capacity as a state official, the outcome of the litigation will not affect the public fisc. Under New York law, the Superintendent liquidates the insolvent insurer, and distributes its assets, for the benefit of its claimants and creditors. N.Y. Ins. Law § 514 (McKinney's 1966) *quoted in* note 4, *supra; Knickerbocker Agency, Inc. v. Holz,* 4 N.Y.2d 245, 250, 173 N.Y.S.2d 602, 609, 149 N.E.2d 885, 890, (1958). No benefit will inure to the state by delivery of this property to the Superintendent other than the facilitation of its general governmental interest in achieving an orderly liquidation. Accordingly, the Federal Interpleader Act permits, and the Eleventh Amendment does not prohibit, the exercise of federal court jurisdiction in this case.[10]

### The Applicable Law

■ As jurisdiction in this case is based upon diversity of citizenship, this court must apply the law of the forum state, including its conflict of law rules, to determine the rights of the parties. *Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Klaxon v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Federal statutory inter-

---

**10.** The Court of Appeals for the Second Circuit dealt with a similar situation in *Porter v. Beha, supra.* In that case, the New York State Superintendent of Insurance, attempting to secure reinsurance for a failing insurance company, ordered the person who controlled the company to raise sufficient funds to avoid liquidation. To meet this demand, the controlling person turned over the proceeds of bonds that he had previously stolen from a bank. When the bank's receiver subsequently sued the Superintendent to impress a lien on the funds, the Superintendent interposed an Eleventh Amendment defense. While it noted the Superintendent's duty to examine New York insurers and to liquidate them on insolvency, 12 F.2d at 513, the court rejected the Superintendent's de-

fense, holding that his primary goal had been "to safeguard the interests of the policy holders." *Id.* at 516. Refusing to find the state to be a real party in interest, the court stated,

It is plain that defendant superintendent does not assert and never has suggested that this money is owned by the state of New York, or that the state has any interest in the matter, except as it desires to fulfill a duty by winding up insolvent insurance companies.

*Id.* at 517. *See also Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Cavicchia, supra,* (New York is not real party in interest in interpleader action in which one claimant is state court-appointed receiver of property derived by securities fraud and held for benefit of those defrauded).

pleader actions, premised upon the diversity of citizenship of the claimants, are no different in this regard from actions brought under the court's general grant of diversity jurisdiction, 28 U.S.C. § 1332 (1970). *Griffin v. McCoach,* 313 U.S. 498, 503, 61 S.Ct. 1023, 85 L.Ed. 1481 (1941); *American Fid. Fire Ins. Co. v. Paste-Ups Unlimited, Inc.,* 368 F.Supp. 219, 223 (S.D.N.Y.1974).

■ This case turns upon an issue of contract interpretation: which of the claimants is the "statutory successor" designated in the insolvency clauses of the various reinsurance treaties? In cases of contract interpretation, New York courts have generally permitted the contracting parties to choose the applicable law. *A. S. Rampell, Inc. v. Hyster Co.,* 3 N.Y.2d 369, 381, 165 N.Y.S.2d 475, 486, 144 N.E.2d 371, 379 (1957); *Levey v. Saphier,* 83 Misc.2d 146, 149, 370 N.Y.S.2d 808, 813 (Sup.Ct.1975). New York courts will uphold choice of law clauses in insurance contracts provided that the law chosen bears a reasonable relationship to the transaction and violates no substantial state public policy. *Reger v. Nat'l. Ass'n. of Bedding Mfrs. Group Ins. Trust Fund,* 83 Misc.2d 527, 539–42, 372 N.Y.S.2d 97, 113–16 (Sup.Ct.1975). All of the treaties in the case at bar provide for arbitration of disputes between the signatories and for New York law to govern the arbitration.[11] (Stipulation of Facts, Exhib. A, art. IX; *id.,* Exhib. B, art. VIII; *id.,* Exhib. C, art. XII). In addition, the Skandia treaty's insolvency clause states that in the event of Professional's insolvency, reinsurance proceeds shall be payable to its "liquidator, receiver, or statutory successor, except as provided by Section 315 of the New York Insurance Law."[12] (Stipulation of Facts, Exhib. B, art. III). None of the treaties, however, explicitly designates the law by which it is to be governed in the event of insolvency.

■ In the absence of an express choice of law provision, New York courts have adopted a governmental interest approach to determine the applicable law. When more than one jurisdiction has an interest in the application of conflicting laws to a given contract action, New York courts have attempted to apply the law of the jurisdiction having the greatest interest in the litigation. That interest is measured by examining the contacts each state has with the action in relation to the policies underlying the conflicting laws. *Intercontinental Planning, Ltd. v. Daystrom, Inc.,* 24 N.Y.2d 372, 382–85, 300 N.Y.S.2d 817, 825–28, 248 N.E.2d 576, 582–584 (1969). This mode of interest analysis has been employed in the context of insurance contracts. *Reger v. Nat'l. Ass'n. of Bedding Mfrs. Group Ins. Trust Fund, supra,* 83 Misc.2d at 542 & n. 10, 372 N.Y.S.2d at 116 & n. 10; *Allstate Ins. Co. v. Sullam,* 76 Misc.2d 87, 98–102, 349 N.Y.S.2d 550, 562–65 (Sup.Ct.1973). Before engaging in interest analysis, however, the court must determine whether the laws of the interested jurisdictions are actually in conflict.

### New York Law

■ In New York, rules for the construction of insurance contracts do not differ from those to be applied for the construction of other contracts, particularly when the contract in question is freely negotiated and not one of adhesion. *Jacobowitz v. Mutual Health & Accident Ass'n,* 10 A.D.2d 159, 162, 198 N.Y.S.2d 7, 10 (1960); *Uni-Serv Corp. v. Frede,* 50 Misc.2d 823, 826–27, 271 N.Y.S.2d 478, 483 (Civ.Ct.N.Y. 1966), *aff'd per curiam,* 53 Misc.2d 644, 279 N.Y.S.2d 510 (1967). The primary rule in

---

11. These arbitration clauses do not deprive this court of jurisdiction. Once a New York insurer is placed in liquidation, it may not be compelled to arbitrate. *Knickerbocker Agency, Inc. v. Holz,* 4 N.Y.2d 245, 149 N.E.2d 885, 173 N.Y. S.2d 602 (1958). Indeed, the order of liquidation terminates the company's existence. *Bohlinger v. Zanger,* 306 N.Y. 228, 234, 117 N.E.2d 338, 341 (1954).

12. Section 315(1)(a) permits a fidelity or surety company to exceed the usual limit on exposure to risk set forth in § 47 only if the insurer is protected by a reinsurance treaty which permits the insured to recover against the reinsurer directly. In the absence of such a provision in a reinsurance treaty, an insured cannot recover against a reinsurer. *See* discussion *infra.*

the construction of contracts is to ascertain and effectuate the intent of the parties thereto. *M. O'Neil Supply Co. v. Petroleum Heat & Power Co.*, 280 N.Y. 50, 55, 19 N.E.2d 676, 679 (1939); *Insurance Co. of N. Am. v. United States Fire Ins. Co.*, 67 Misc.2d 7, 10, 322 N.Y.S.2d 520, 523 (Sup.Ct. 1971), *aff'd*, 42 A.D.2d 1056, 348 N.Y.S.2d 122 (1973). Unless the contract provides otherwise, the law in force at the time it is entered into becomes a part of the contract. It is presumed that the parties had that law in contemplation when the contract was made, and the contract must be construed in that light. *Dolman v. United States Trust Co.*, 2 N.Y.2d 110, 116, 157 N.Y.S.2d 537, 542, 138 N.E.2d 784, 787 (1956). Therefore, in order to properly construe the insolvency clauses upon which this case's outcome hinges, this court must first situate those clauses against the backdrop of New York's law of reinsurance and insurer insolvency.

▬ Reinsurance is the "ceding by one insurance company to another of all or a portion of its risks for a stipulated portion of the premium, in which the liability of the reinsurer is solely to the . . . ceding company, . . . [which] retains all contract with the original insured, and handles all matters prior to and subsequent to loss." 13A J. Appleman & J. Appleman, *Insurance Law & Practice* § 7681, ch. 278, at 480 (rev. ed. 1976). In contrast to an insurer's obligation to pay and defend against its insured's liability whether or not the insured has paid injured third parties, the reinsurer's liability is conditioned upon the insurer's prior payment of loss. *National Ins. & Guar. Corp., Ltd. v. Vander Veer*, 66 Misc.2d 862, 866, 322 N.Y.S.2d 293, 298 (Sup. Ct.1971). A reinsurance treaty is a contract of indemnity, not a contract of liability. *Greenman v. General Reins. Corp.*, 237 App. Div. 648, 649, 262 N.Y.S. 569, 570 (1933); *Insurance Co. v. Park & Pollard Co.*, 190 App.Div. 388, 393, 180 N.Y.S. 143, 147 (1920). Consequently, New York courts

have refused to consider the insured a third party beneficiary of the reinsurance treaty even if the insurer has become insolvent. *Sofia Bros. v. General Reins. Corp.*, 153 Misc. 6, 9–10, 274 N.Y.S. 565, 569 (Sup.Ct. 1934). Absent specific language in the treaty to the contrary, an insured cannot recover against a reinsurer.[13] *General Reins. Corp. v. Williams*, No. 75–1336, at 3 (S.D.N.Y. March 23, 1976); *see Greenman v. General Reins. Corp., supra*, 237 App.Div. at 649, 262 N.Y.S. at 570.

The primary significance of reinsurance is that the insurer may treat it as an asset on its financial statements. An insurer doing business in New York may not expose itself to a loss on any one risk which exceeds 10% of its surplus. N.Y. Ins. Law § 47 (McKinney 1966). Reinsurance, however, may be carried as an asset in computing the 10% risk limitation. *Id.* By utilizing reinsurance, therefore, an insurer can spread the risk it undertakes over a larger number of policies, effectively reduce the amount of reserves required to maintain its business, and increase its profitability. Olson, *Reinsurer's Liability to the Insolvent Reinsured*, 41 Notre Dame Law. 13, 15–16 (1965).

Reinsurance takes on added significance when the insurer becomes insolvent. Article XVI of the New York Insurance Law, §§ 510–46, insofar as it relates to the liquidation of insolvent insurers, provides an exclusive, comprehensive procedure for the winding up of their affairs. *Motlow v. Southern Holding & Sec. Corp.*, 95 F.2d 721, 724 (8th Cir. 1938); *Knickerbocker Agency, Inc. v. Holz, supra*, 4 N.Y.2d at 250, 149 N.E.2d at 888–89, 173 N.Y.S.2d at 606; *In re Lawyers Title & Guar. Co.*, 254 App.Div. 491, 492, 5 N.Y.S.2d 484, 486 (1938). The Superintendent of Insurance applies to the Supreme Court for an order of liquidation. N.Y. Ins. Law §§ 513, 526 (McKinney 1966). Once the court orders liquidation, it has exclusive jurisdiction of claims both against and in favor of the insolvent insurer, *Knick-*

---

**13.** Thus, Guaranty cannot successfully argue that it is entitled to the reinsurance proceeds because it is subrogated to the rights of the insureds whose claims it has paid against the reinsurers. Under New York law, the insureds have no such rights against the reinsurer.

*erbocker Agency, Inc. v. Holz, supra,* 4 N.Y.2d at 250, 149 N.E.2d at 889, 173 N.Y. S.2d at 606, and the Superintendent of Insurance is vested by operation of law "with the title to all of [its] property, contracts, and rights of action." N.Y. Ins. Law § 514 (McKinney 1966), *quoted in* note 4, *supra; accord, Knickerbocker Agency, Inc. v. Holz, supra,* 4 N.Y.2d at 250, 149 N.E.2d at 889, 173 N.Y.S.2d at 607. The Superintendent then proceeds to liquidate the insurer for the benefit of all of its creditors.[14] *Motlow v. Southern Holding & Sec. Corp., supra,* 95 F.2d at 724; *In re Lawyers Title & Guar. Co., supra,* 254 App.Div. at 492, 5 N.Y.S.2d at 486.

For a time, there was some doubt whether the Superintendent's acquisition of title to the insolvent's assets extended to proceeds from reinsurance treaties. In the landmark Supreme Court decision of *Fidelity & Deposit Co. v. Pink,* 302 U.S. 224, 58 S.Ct. 162, 82 L.Ed. 213 (1937), the New York Superintendent of Insurance, acting as the liquidator of an insolvent insurer, allowed a claim against the insolvent and demanded payment from the reinsurer under the standard form of reinsurance agreement then in use. *Id.* at 225–26, 58 S.Ct. 162. The reinsurer refused to pay, asserting that the treaty unambiguously provided that it reinsured only "against loss" and that its liability to indemnify arose only upon payment of the claim by the insurer. Payment by the insurer was obviously impossible because the liquidation order had rendered it defunct. Nevertheless, the Court upheld the reinsurer in its narrow reading of the indemnity provision, *id.* at 229, 58 S.Ct. 162, thereby permitting the reinsurer to escape all liability.

To remedy this result, the New York legislature enacted 1939 N.Y. Laws, c. 882, § 77, codified, as amended, at N.Y. Ins. Law § 77 (McKinney 1966). That section provides, in pertinent part:

No credit shall be allowed, as an admitted asset or as a deduction from liability, to any ceding insurer for reinsurance . .

unless the reinsurance shall be payable by the assuming insurer under the contract or contracts reinsured without diminution because of the insolvency of the ceding insurer . . . . [N]o such credit shall be allowed any ceding insurer for reinsurance . . . unless the reinsurance agreement provides that *payments by the assuming insurer shall be made directly to the ceding insurer or to its liquidator, receiver or statutory successor . . . .* (emphasis added).

Section 77's purpose is clear. If an insurer wishes to treat its reinsurance contracts as assets for the purpose of the 10% risk limitation of § 47, those contracts must make the full amount of reinsurance payable to either the insurer or the Superintendent, as liquidator, receiver, or statutory successor, in the event of the insurer's insolvency. Although § 77 appears to make the inclusion of this insolvency clause an option matter, the insurer is effectively compelled to do so. Reinsurance loses most of its value if it cannot be credited as an admitted asset or a deduction from liability. Olson, *supra,* 41 Notre Dame Law. at 22. Section 77 thereby functions to increase the size of the pool of available assets in which all of the defunct insurer's creditors may share.

In light of this long-standing statutory framework for the liquidation of an insolvent insurer's assets, including reinsurance proceeds, it is clear that a New York court would construe the insolvency clauses in Professional's reinsurance treaties to provide that the Superintendent recover the proceeds. Each of the clauses tracks the language of § 77, and the inference is strong that Professional included them in the treaties in order to avail itself of the full advantages of reinsurance. At the time these treaties were entered into, Guaranty did not even exist. It seems illogical to suggest that the treaty signatories intended to confer the proceeds to a then non-existent party, particularly when to have done so would have vitiated the principal purpose for entering the reinsurance transaction.

---

**14.** Creditors seeking to recover on amounts owed them by the insolvent insurer must file proofs of claim as set forth in N.Y. Ins. Law §§ 520–21 (McKinney (1966).

Guaranty, acknowledging that it is not the generally accepted "statutory successor" within the meaning of the New York Insurance Law, argues that this court may award it the proceeds on the basis of "general equitable principles." Because the New Jersey statute obligated it to satisfy the claims made by Professional's insureds, Guaranty contends that it should be equitably subrogated to Professional's rights against the plaintiffs on the reinsurance treaties. Guaranty, however, misconceives the role of this court in a diversity action. After *Erie R.R. v. Tompkins, supra,* this court is no longer free to fashion general equitable principles when deciding diversity cases; it must apply the forum state's law.[15]

As New York courts view the equities, the Superintendent is the proper recipient of the proceeds. The purpose of New York's statutory liquidation procedure is to effect an "equitable division" of the defunct insurer's assets. *Van Schaick v. Astor,* 153 Misc. 377, 379, 274 N.Y.S. 322, 326 (N.Y.City Ct.1934), *rev'd on other grounds,* 154 Misc. 543, 277 N.Y.S. 394 (App. Term 1935). In distributing the insolvent's general assets, all creditors are entitled to share equally in proportion to their claims. *Id.* "[E]quity requires that the assets of the insolvent party be equally distributed among such general creditors." *Pink v. Title Guar. & Trust Co.,* 274 N.Y. 167, 175, 8 N.E.2d 321, 325 (1937); *accord, Bohlinger v. Zanger,* 306 N.Y. 228, 234, 117 N.E.2d 338, 341 (1954). New York courts have long held that a fund arising from reinsurance treaties must be distributed pro rata among all creditors. The original insured, as worthy a beneficiary of a court's equitable sympathies as Guaranty, has continually been denied the right to a preference as to reinsurance proceeds. *Sofia Bros., Inc. v. General Reins. Corp., supra,* 153 Misc. at 10, 274 N.Y.S. at 569; *Herckenrath v. American Mut. Ins. Co.,* 3 Barb.Ch. 63, 70 (1848).

The preference Guaranty seeks would also be contrary to the terms of the Uniform Insurers Liquidation Act, which has long been the law in New York. 1940 N.Y. Laws, c. 631, § 1, codified, as amended, at N.Y. Ins. Law §§ 517–23 (McKinney 1966 & Cum.Supp. 1976–77). This act's purpose is "to provide for a uniform, orderly and equitable method of making and processing claims against the defunct insurer and to provide for a fair procedure to distribute the assets of said defunct insurance carrier." *Vlasaty v. Avco Rent-A-Car Sys., Inc.,* 60 Misc.2d 928, 930, 304 N.Y.S.2d 118, 120 (Sup.Ct.1969). To assure equality, § 522(1) provides:

> In a delinquency proceeding against an insurer domiciled in this state, claims owing to residents of ancillary states shall be preferred claims if like claims are preferred under the laws of this state. All such claims whether owing to residents or nonresidents shall be given equal priority of payment from general assets regardless of where such assets are located.

The New York property and liability insurance security fund, created in 1969 to extend protection to resident policyholders against the insolvency of insurers authorized to do business in New York, 1969 N.Y. Laws, c. 189, § 3, codified, as amended, at N.Y. Ins. Law § 334 (McKinney Cum.Supp. 1976–77); *see Dutchess & Columbia Coop. Ins. Co. v. State,* 81 Misc.2d 402, 403–04, 367 N.Y.S.2d 365, 367 (Ct.Cl.), *aff'd,* 43 A.D.2d 769, 350 N.Y.S.2d 766 (1973), *aff'd,* 36 N.Y.2d 835, 370 N.Y.S.2d 907, 331 N.E.2d 686 (1975), is New York's functional equivalent of Guaranty. The commissioner of taxation and finance, as custodian of the fund, may maintain a claim against an insolvent insurer of the liquidator "in an amount equal to the liabilities of such insurer paid from the fund less the net payments paid into the fund by the insurer." N.Y. Ins. Law § 333(7) (McKinney 1966). The fund's claim, however, is on a par with those of all other general creditors. Since

15. "To make an exception to *Erie R. Co. v. Tompkins* on the equity side of a federal court is to reject the considerations of policy which, after long travail, led to that decision." *Guar-* *anty Trust Co. v. York,* 326 U.S. 99, 111, 65 S.Ct. 1464, 1471, 89 L.Ed. 2079 (1945) (Frankfurter, J.).

New York's property and liability insurance security funds is not a preferred creditor under New York law, § 522(1) requires that Guaranty receive no preference.

In sum, under New York law, the Superintendent is the proper recipient of the reinsurance proceeds.

*New Jersey Law*

Guaranty premises its claim to be Professional's statutory successor upon a novel interpretation of a single subsection of the New Jersey Guaranty Act. Section 8(a)(2) of that act states that Guaranty shall "[b]e deemed the insurer to the extent of its obligation on the covered claims and to such extent shall have all rights, duties, and obligations of the insolvent insurer." N.J.Stat. Ann. § 17:30A–8(a)(2) (West Cum.Supp. 1977–78). Guaranty contends that this subsection vests it with rights to the reinsurance proceeds that Professional could have claimed had it made the payments on the matured New Jersey risks which the act has required Guaranty to make. Accordingly, Guaranty claims to be Professional's statutory successor to the extent of the reinsurance proceeds which have accrued, and will accrue, by virtue of the payments Guaranty has made to Professional's New Jersey policyholders.

 Read without reference to the remaining sections of the act, section 8(a)(2) admittedly provides a limited basis for imputing statutory successor status to Guaranty—an insurer's rights to reinsurance proceeds obviously arises from its obligations to its insured. Guaranty's construction of that section, however, does violence to the remainder of the statutory text. Section 8, entitled "Obligations, duties and powers," defines the policies on which Guaranty must make good [§ 8(a)(1)], authorizes it to assess its members for the claims and expenses it incurs [§ 8(a)(3)], and empowers it to perform the administrative and legal functions necessary to make the payments

[§ 8(a)(4)–(7), (b)]. The entire thrust of § 8, therefore, is the definition of Guaranty's, and its member insurers', *obligation* to pay. Read in conjunction with the rest of the section, § 8(a)(2) is not an affirmative grant of the right to recover on the insolvent's reinsurance treaties, but rather a *limitation* on Guaranty's general obligation to pay covered claims. This provision merely permits Guaranty to assert any defenses the insolvent insurer would have had on the underlying policy.

An examination of the remaining sections of the New Jersey Guaranty Act bolsters the conclusion that § 8(a)(2) does nothing more than render Guaranty's obligation to pay co-extensive with that of the insolvent. Section 11 of the act defines Guaranty's right of recovery in insurer liquidations. It states, in pertinent part:

a. Any person recovering under this act shall be deemed to have assigned his rights under the policy to the association to the extent of his recovery from the association. . . .

b. The receiver, liquidator, or statutory successor of an insolvent insurer shall be bound by settlements of covered claims by the association. . . . The court having jurisdiction shall grant such claims priority equal to that which the claimant would have been entitled in the absence of this act against the assets of the insolvent insurer. . . .

c. The association shall periodically file with the receiver or liquidator of the insolvent insurer statements of the covered claims paid by the association and estimates of anticipated claims on the association which shall preserve the rights of the association against the assets of the insolvent insurer.

*Id.* § 17:30A–11 (West Cum.Supp. 1977–78). The statutory scheme is readily apparent. Guaranty is subrogated to the rights of the insolvent's insureds to the extent of the claims it pays out;[16] it must file a proof of

---

16. New Jersey recognizes the indemnity nature of the reinsurance contract, *Vera Democrazia Soc. v. Banker's Nat'l. Life Ins. Co.*, 10 N.J. Misc. 632, 632–33, 160 A. 767, 768 (1932), and

permits an insured to recover over against a reinsurer only if the latter agreed to be directly liable in the reinsurance contract. *Meyer v. National Sur. Co.*, 90 N.J.L. 126, 129, 100 A.

claim with the insolvent's statutory successor to preserve its rights on liquidation; it enjoys the same priority that New Jersey insureds would have enjoyed in the absence of Guaranty's payment of their claims.[17] These provisions clearly negate Guaranty's contention that the New Jersey Guaranty Act renders it Professional's statutory successor.

Nevertheless, Guaranty asserts that considerations of public policy should lead the court to conclude that it is the proper recipient of the reinsurance proceeds. Since the New Jersey Guaranty Act empowers it to recoup the amount it pays on covered claims by increasing its premiums on policies written within the state, *id.* § 17:30A:16, Guaranty argues that failure

to award it the proceeds would increase the cost of insurance for New Jersey residents. But competing public policy considerations abound. State insolvency protection statutes protect only resident policyholders from the misfortune of insurer insolvency. To the extent that Guaranty and, indirectly, the New Jersey insureds it represents are awarded a preference, Professional's other general creditors, including insureds from states without guaranty funds, necessarily receive smaller liquidation dividends. There is nothing to suggest that the New Jersey legislature, in providing an "association to assess the cost of . . . protection [against insolvency] among insurers," *id.* § 17:30A–2(a), intended anything but to spread the cost of insolvency among solvent insurers and their New Jersey customers.[18]

164, 164 (1917). Thus, Guaranty has no right to the proceeds as the insureds' subrogee under New Jersey law.

**17.** Apart from the clear statutory intent that Guaranty enjoy no preference as to the reinsurance proceeds, New Jersey has long maintained a strong public policy of equal treatment of creditors in liquidation proceedings. *See Bohlinger v. Ward & Co.,* 34 N.J.Super. 583, 591, 113 A.2d 38, 43 (App.Div.1955), *aff'd,* 20 N.J. 331, 120 A.2d 1 (1956); *Clifford v. Concord Ins. Co.,* 114 N.J.Super. 168, 172, 275 A.2d 454, 456 (Super.Ct.Ch.Div.), *aff'd,* 114 N.J.Super. 495, 277 A.2d 400 (Super.Ct.App.Div.1971); *Engineering Co. v. Perryman Elec. Co.,* 113 N.J.Eq. 255, 256, 166 A. 461, 462 (Ch.), *aff'd,* 114 N.J.Eq. 51, 168 A. 298 (1933); *Clark v. Painted Post Lumber Co.,* 89 N.J.Eq. 409, 410–11, 104 A. 728, 728–29 (Ch.1918).

**18.** Although there are several reported cases dealing with the rights of guaranty associations in other NAIC Model Bill states, none of them lends support to Guaranty's position. In *Smith v. Ohio Valley Ins. Co.,* No. 241494 (Ohio, C.P. Franklin Cty. Feb. 11, 1974), an Ohio liquidation proceeding and declaratory judgment action to which the Ohio Insurance Guaranty Association ("Ohio Guaranty") was a party, the court held that the proceeds of reinsurance contracts were payable to the state's Superintendent of Insurance, as liquidator of the insolvent insurer, and not to the policyholders of the insolvent. In an opinion dated March 6, 1974, the court further held that these claimants had no priority over other creditors with respect to the reinsurance proceeds paid to the Superintendent. Guaranty contends, however, that a subsequent decision by the same court may be cited for the general proposition that guaranty associations should be afforded "special treat-

ment" in insurer liquidations. On March 15, 1976, the court held that Ohio Guaranty may file a proof of claim in liquidation after the time limit previously set by the court pursuant to Ohio Rev.Code Ann. § 3903.21 (Baldwin 1976). Guaranty reads far too much into this decision. The Ohio court merely recognized that few, if any, covered claims had been presented to Ohio Guaranty for payment as of the date the court had set for filing proofs of claim. Ohio Guaranty preserved its rights in liquidation by complying with *id.* § 3955.12(C) which required it to "periodically file with the . . . liquidator . . . reports of the covered claims paid and estimates of anticipated claims." The court thus regarded guaranty associations as unique only in that they were "continuously acquiring new rights and obligations as it paid the claims" of the insolvent insurer. *Smith v. Ohio Valley Ins. Co.* No. 241494, at 2 (Ohio, C.P. Franklin Cty. March 15, 1976).

In *Arizona Ins. Guar. Ass'n. v. Humphrey,* 109 Ariz. 284, 508 P.2d 1146 (1973) both the Arizona Guaranty Association ("Arizona Guaranty") and the Arizona Director of Insurance, as ancillary receiver of an insolvent insurer, sought to recover unearned commissions from the insolvent's Arizona agents. Arizona Guaranty contended that since it was required to pay unearned premiums to the insolvent's insureds, it was entitled to recover the unearned commissions on those premiums. 109 Ariz. at 286, 508 P.2d at 1148. It relied upon the same statutory language as Guaranty has in the case at bar—that "[it] shall be deemed the insurer to the extent of its obligations on covered claims." Ariz.Rev.Stat. § 20–664(A)(2) (1975). The court held that the receiver was entitled to the unearned commissions. Under the terms of the Arizona statute, *id.* § 20–667(A) Arizona Guaranty was subrogated to the rights of the

Both under New York and New Jersey law, therefore, the Superintendent is Professional's statutory successor and the proper recipient of the proceeds of its reinsurance treaties. Accordingly, the court need not reach the conflict of laws issue.

### Relief

In a federal statutory interpleader action, the court is empowered to "hear and determine the case, . . . discharge the plaintiff from further liability, make the injunction [restraining the claimants from instituting or prosecuting any proceeding in any state or United States court affecting the property] permanent, and make all appropriate orders to enforce its judgment." 28 U.S.C. § 2361 (1970).

Having heard this case and having determined that the Superintendent is the statutory successor to the defunct insurer under its reinsurance treaties, the Superintendent's motion for summary judgment is granted and Guaranty's motion for summary judgment is denied. The court awards the deposited funds to the Superintendent for distribution to all the creditors of Professional in accordance with the New York Insurance Law. As to risks insured by Professional which have either already resulted in the generation of reinsurance proceeds not deposited with this court, or will result in the generation of proceeds in the future, the court declares the Superintendent to be the proper recipient thereof and directs the plaintiffs liable therefor to pay them over to the Superintendent as they become payable. In order to relieve the plaintiffs of the burden of defending against any further litigation of the issue, this court permanently enjoins Guaranty from prosecuting any pending claim, or

making any future claim, to the reinsurance proceeds arising from Professional's treaties with plaintiffs. *Provident Mut. Life Ins. Co. v. Ehrlich,* 508 F.2d 129, 135–36 (3d Cir. 1975); *Francis I. duPont & Co. v. Sheen,* 324 F.2d 3, 4 (3d Cir. 1963).

### Attorneys' Fees

■ All plaintiffs have moved to recover the attorneys' fees and litigation costs they have incurred in instituting this interpleader action. As a general rule, litigants must pay their own attorneys' fees absent statutory or contractual authorization. *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 257, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). The federal courts, however, have long exercised the equitable power to permit a party preserving a fund for the benefit of others to recover his costs, including reasonable attorneys' fees, either from the fund itself or directly from the parties enjoying the benefit. *Id.* at 257–58, 95 S.Ct. 1612. Thus, costs and counsel fees have been awarded to a stakeholder-plaintiff who commences an interpleader action as a matter of the court's sound discretion. *Travelers Indem. Co. v. Israel,* 354 F.2d 488, 490 (2d Cir. 1965).

■ There is some question whether a federal court exercising statutory interpleader jurisdiction must apply the forum state's law as to the recovery of attorneys' fees. *Compare Bank of China v. Wells Fargo Bank & Union Trust Co.,* 104 F.Supp. 59, 67 (N.D.Cal.1952), *rev'd on other grounds,* 209 F.2d 467 (1953) (applying federal rule), *with Aetna Life Ins. Co. v. Johnson,* 206 F.Supp. 63, 65 (N.D.Ill.1962) (applying Illinois rule). *See generally* 3A J. Moore, *Federal Practice* ¶ 22.16[2] (1974 ed.)[19] In this

insureds whose claims it paid. Since the insured had no right to the unearned commissions, neither did Arizona Guaranty as their subrogee. 109 Ariz. at 286, 508 P.2d at 1148–49. *See also Cooper Claims Serv., Inc. v. Arizona Ins. Guar. Ass'n,* 22 Ariz.App. 156, 158, 524 P.2d 1329, 1331 (Ct.App.1974) ("Guaranty does not assume all the rights and liabilities of an insolvent insurance company; it has a very limited and specific purpose for its existence as outlined by the statute. It is not a substitute

for the normal insolvency proceedings but merely an adjunct to them.")

19. The Court of Appeals for this Circuit has permitted the recovery of fees without discussion of the *Erie* problem. *Globe Indem. Co. v. Puget Sound Co.,* 154 F.2d 249, 250 (2d Cir. 1946). In *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, supra,* the Supreme Court stated that "in an *ordinary* diversity case where the state law does not run counter to a valid federal statute or rule of court . . . state law

case, however, there is no conflict between the federal rule and the applicable state rule. New York courts, too, in the exercise of sound discretion, have permitted a stakeholder to recover costs and reasonable attorneys' fees. *MacQueen Realty Co. v. Emmi,* 58 Misc.2d 54, 57, 294 N.Y.S.2d 566, 570–71 (Sup.Ct.1968); *Metropolitan Life Ins. Co. v. Brody,* 35 Misc.2d 384, 385, 228 N.Y.S.2d 312, 313 (Sup.Ct.1962).

As a matter of discretion, the court awards plaintiff General Reinsurance attorneys' fees of $2500 and disbursements of $670.31. Plaintiffs Skandia and Lloyd's are each awarded $1250 in attorneys' fees and $263.39 in disbursements. Each of these awards shall be payable from the funds that plaintiffs have deposited with the court.

Settle order on five days' notice.

denying the right to attorney's fees or giving a right thereto, which reflects a substantial policy of the state, should be followed." 421 U.S. at 259 n. 31, 95 S.Ct. at 1622, quoting 6 J. Moore, *supra,* ¶ 54.77[2], at 1712–13. (emphasis added). A federal statutory interpleader action, however, is not the ordinary diversity case. The interpleader statute was enacted to protect those stakeholders who faced the possibility of multiple liability because they could not acquire jurisdiction over the diverse claimants to a fund in any one state forum. *Klaber v. Maryland Cas. Co.,* 69 F.2d 934, 937–38 (8th

Cir. 1934). "It is fully consistent with this protective policy—if not dictated by it—that the federal court . . . be empowered to further that protective policy by awarding in appropriate circumstances reasonable recompense to the stakeholder for his counsel fees." 3A J. Moore, *supra,* ¶ 22.16[2], at 3157. Moreover, the federal courts' usual concern with forum-shopping when deciding whether to apply a federal rule is often irrelevant in the statutory interpleader context as there is frequently no state forum in which the stakeholder may acquire jurisdiction over all claimants.